19-325. Page 21 of 21 Paul Clement for Appellant Ben Chau. Your Honors, this case is extraordinary. Ben Chau was convicted of insider trading in the Southern District of New York, but he never stepped foot in the Southern District. He never traded any shares himself, nor did he receive anything that's identifiable as a personal benefit. But most remarkable of all, Chau stands convicted of breaching a quasi-fiduciary duty to Lattice, the target of his funds acquisition efforts. The government jumps the tracks from Chau's undoubted fiduciary duty to his own funds to a simultaneous duty to Lattice based on NDAs that Chau signed on behalf of the funds. That theory is entirely novel, and the government's broader legal claim that any NDA is sufficient to impose a duty for insider trading purposes is, with all due respect, entirely wrong. Wouldn't that be, Mr. Clement, overruling our past precedent? We have said over and over again that an explicit acceptance of a duty of confidentiality is sufficient. Falcon said that Walters, Afray, even the Supreme Court case in O'Hagan said that a contractual obligation can suffice. So it seems like you're asking us to put limitations on what type of NDA will satisfy it when we've said in the past that an explicit acceptance of a duty of confidentiality is sufficient. With respect, Your Honor, I don't think that's the holding of any of those cases, and I think most of those cases have, you know, and certainly Which one of those cases has put a limitation on it? You're trying to factually distinguish them. No, it's, with all respect, it's not a factual distinction. It's if you go back to Chiarella, if you go back to Chessman, what this Court has said is that you need a fiduciary duty or a quasi-fiduciary duty, which is a relationship of trust and confidentiality. And what the government wants to do, and there's no holding to support it, not in this circuit or any other circuit, is to say that a duty of contractual duty of confidentiality alone suffices. And that's fundamentally wrong with all due respect, Your Honor, and there's no precedent for it. Let me just quote Falcon. A fiduciary relationship or its functional equivalent exists only where there is an explicit acceptance of a duty of confidentiality or, and I emphasize or, where such acceptance may be implied from a similar relationship of trust and confidence between the parties. So trust and confidence. That's the or, right? Your Honor, look, if you want to have a weight of dictum of how many times this Court has used the conjunctive versus the disjunctive, I'm happy to have that discussion. I think I'm going to win. I mean, I'm not here to tell you that there aren't statements in dictum that use the disjunctive, but the point is there's no holding. Not Falcon. Falcon involves an employment relationship. And if you look at the cases, all of them, look, if they wanted to bring this case based on the theory that Chau owed a fiduciary duty to the funds, it would fit all within the structure of the cases, but they didn't bring that theory. Walters, Walters didn't involve an employee. Walters involved co-investors, right? Exactly, Your Honor. And again, there's no jumping of the tracks. If you think about co-investors, I think that's a classic example of quasi-fiduciary relationship. If two of us are investing together, I'm going to give you some information. I'm going to do it in service of our joint efforts. But that's not the situation when you have an arm's-length negotiation. When you have an arm's-length negotiation, they're not entrusting this information to Chau so that he can use it for Lattice's benefit. They're entrusting it to Chau so he can do the due diligence on behalf of the funds. And so, of course, he owes a duty to the funds, but he doesn't owe a duty to Lattice. Take a simpler example, Your Honor. If you and I were negotiating over the sale of a house, and I made an offer on the house, and then we entered an NDA and said, look, neither of us really want anyone else knowing what I offered you for the house. If I then told somebody what I offered for the house, I would be breaching a contract, but I would be breaching no duty, no quasi-fiduciary duty to you. We're negotiating at arm's length. We're the opposite. And so in order to reach the opposite conclusion, if you go all the way back to the case that this Court relied on in Chessman, the Walton against Morgan Stanley case, which involved a very parallel situation where you had an acquirer who got confidential information in the context of negotiation and then used it on behalf of another client, Morgan Stanley got the information and then used it on behalf of somebody else, this Court held that the entrustment of that confidential information was not enough. So in order to say that this case is different from Walton, what you have to say is everything changes when there's a contractual agreement. And I don't think the law sustains that. There's no precedent that says it. But more importantly, it's fundamentally inconsistent with the underlying theory of why insider trading is fraudulent. And this Court very recently in the O'Donnell case made crystal clear that a breach of contract is not a breach of a fiduciary duty or fraud. And so with all respect, there are going to be plenty of cases where you have an NDA that's entirely consistent and indeed evidence of a fiduciary or quasi-fiduciary relationship. So I understand you to argue also that this was no breach of the NDA because this was his information about his own intentions. Exactly, Your Honor. Is it your position, then, that he was free to share any information about his intentions with Mr. Yin throughout the course of the negotiations and there was no constraint? We should look with interest but no concern about the detailed timeline produced by the government showing Mr. Yin trading regularly after meeting and in large quantities after meeting with Mr. Chow that this is perfectly legal and no one participating in the market should have any concerns about it as well. It's just not unlawful. Is that right? That's right, Your Honor. And I think that supported by the terms of the NDA itself, which if you look at it, where the actual covenant not to disclose proprietary information, it's proprietary information of the other party. But didn't it also impose an obligation of confidentiality with respect to the fact of the transaction? It's specifically worded and it's quite limited. It defines proprietary information to include the fact of the exploration and evaluation of a potentially strategic relationship. Now, and again, that's, to be clear, that's within the definition of proprietary information. The actual covenant not to disclose is proprietary information of the other party. So the way I would read those two together is to say that he can't disclose Lattice's information about the sort of state of the negotiations. But I think the key thing is that probably the most interesting piece of information for Yin would be how much Chow would be willing to pay, his reservation price. If he's willing to go up to nine for Lattice, then it's almost certain this deal will go through and that would be highly interesting information for Yin. And I don't see why it would violate the nondisclosure agreement. Of course, if it did violate the nondisclosure agreement, that would actually show even more clearly that this isn't anything other than a contractual breach. I mean, I can agree with you to not disclose my own information as a matter of contract, but I don't think since it's my information and I came to the table with it, I wouldn't think the agreement not to disclose it would in any way constitute the kind of duty that you need in order to engage in fraud. Although one could interpret the NDA differently to say, we're not going to talk about this to reflect an agreement that neither side was going to talk about the fact that they were exploring because it affects price. I mean, there can be any number of reasons that they would choose to protect the transaction, right? I suppose one could. I mean, but at some point, if we're going to get into sort of detailed discussions about how you interpret the NDA, I mean, at some point, it seems to be in a criminal prosecution, the rule of lenity and similar notions should kick in. But I do think as, you know, sort of as we began with the colloquy, I do think the fundamental threshold problem with the government's case is that this is just a contractual duty, which is insufficient. Very good. You have two minutes of rebuttal. May it please the court. My name is Alicia Cobrey and I represent the United States on appeal. I also represented the United States before the district court. First, Chau's express agreements in the NDA is not to disclose or use information about the proposed merger created a duty of trust and confidence in Lattice. This court has repeatedly held in Chessman, in Falcone, and more recently in Walters, that an express agreement of confidentiality creates a duty of trust and confidence under insider trading law. Walters is really not distinguishable. Chau tries to distinguish it by saying that they're not, that the parties were on, and Walters were on the same side of the transaction. But Walters, it was an NDA, it was an arm's length contract, an express agreement that was negotiated there. There were none of the hallmarks of any kind of fiduciary duty. But Mr. Cobrey, why does it make sense to read the NDA this way, even if there were a general obligation, and we were to agree with you that an obligation of trust or fiduciary-like nature could be inferred from the fact of the NDA. This is his own information about his own plans and thinking about whether he wanted to go forward with this transaction. Why does he have an obligation, having agreed with the opposing party, not to share that or to give hints about it to someone? So, Your Honor, two points on that. One, on just a factual basis, it was not solely his own information. This was ongoing negotiations between him and Lattice. It takes two to tangle, Your Honor. They were going back and forth, and the state of play in terms of where the merger stood, whether it was moving forward, whether a contract was going to be signed, was just as much Lattice's as it was his. But, of course, we have very little direct information about exactly what was shared, right? We have a trading pattern. We have a chronology. More than that, Your Honor, you have messages in which Chao said he's over here at this company about to sign the contract. You have him relating just days after he had communications with Yin, Yin relating that he had learned from a friend that the project was, quote, unquote, moving forward. So you do have substantive communications which also support the very compelling trading patterns. I think you pointed out that on that last conversation you referred to, the jury acquitted on the charge that related to that specific communication, right? That's true, Your Honor, but on a sufficiency argument, the court can consider even acquitted conduct. So, you know, I think it's the mix of all that information coming together which was, you know, quite compelling. Let me just ask you, Mr. Lentz, fundamental argument, I think, is that the government's position is that any NDA will do. In other words, if you have an NDA that precludes you from sharing information of any type, no matter what your relationship is between the parties, that all of those are sufficient. Is that the government's position? Any express agreement will be sufficient to create a duty such that the intentional breach of that duty for a personal benefit would violate insider trading law, yes. His argument is that this has never been applied to this type of situation where you have people on opposite sides of a transaction who have entered into one of these NDAs. Is he right about that? Has it ever been applied to this type of situation? Again, Your Honor, I think Walters is not two people on the opposite side of a negotiation, but again, it's a distinction without a difference. The law is not, I mean, the appellant keeps on using the term quasi-fiduciary. That's not the law. The law is a fiduciary duty or a similar relation of trust and confidence. And this Court has been clear repeatedly that an express agreement can create a duty of trust and confidence. If I could just briefly address the appellant's countrywide argument. This case has nothing to do with nothing. The countrywide really is inapplicable here. That was a case about whether a breach of a contract created a fraud. It didn't address the question about whether a contract can create a duty going forward. As a matter of fact, the court in countrywide specifically, specifically reserved that and said that that had nothing to do with the government's theory in that case, which was an affirmative misrepresentation and whether that in and of itself can create a fraud. Roberts. You said in your brief, you noted that this Court has a case under advisement, Kaczynski. That's correct, Your Honor. That's been argued here before and that same issue has come up in Kaczynski. Same exact issue that we have here, right? It is, Your Honor. I think there are some technical issues there which make that case a little bit different. The contract wasn't as clear as the NDA was, I think in this case, where it specifically prohibited both the transmission of the confidential information as well as the use of it. But yes, it's essentially the same issue. The relationship of the parties was a little bit different there as well, right? Didn't it involve a trial, right? Clinical trial. Clinical trial. I'm sorry. It did involve. I'm saying the relationship of the parties was a little bit different than what we have in this case, right? That's correct, Your Honor. If I can just briefly address some of the other points that the Apollo raised in its brief. So just with respect to the argument on Section 1348, this Court has just recently decided on December 30th in the Blazak case that personal benefit is not to be imported into from the Title 15 securities fraud context to the Title 15. I actually think we ought to hear from both parties about the effect of Blazak. We will put in a letter, Your Honor. And Mr. Clement, yeah. No more than five pages, okay? Thank you, Justice. We will do so. And just finally, just with respect to venue, Your Honor, there was more than sufficient evidence for a rational jury to conclude based on a preponderance of the evidence that the venue was proper in the Southern District of New York. There were four, really four, four important, four among others, but four important facts that go into the venue issue. Number one, the jury had before it evidence that the NASDAQ where Lattice was traded is headquartered in Manhattan. I don't understand why that has anything to do with venue. I mean, we're talking about foreseeability and fairness to a defendant who never set foot in this jurisdiction and who is dealing with individuals and entities far from here. I mean, this strikes me as even more illusory than, you know, crossing over the bridge to Staten Island from New Jersey. I mean, so why was this foreseeable to Mr. Chau? And what's your strongest case for venue? Yes, Your Honor. So it was for, Mr. Chau, there was evidence of trauma. Mr. Chau is a sophisticated businessman. He was negotiating for the purchase of Lattice. He was the one who was negotiating for the purchase of Lattice stock, which he understood was traded on the NASDAQ. But does this mean anyone who's sophisticated and who trades on the NASDAQ is subject to fraud charges potentially in the Southern District of New York? Your Honor, it's not just that. In this case, we had not only the fact that it was traded on the NASDAQ, we have the fact that the opposing broker who executed the transactions was Merrill Lynch based in Manhattan. But there's some question about Merrill Lynch about exactly where that happened. Again, what is your strongest case that something happened that's relevant in the Southern District of New York that Mr. Chau would have had reason to know about? Okay, so let me, if I can just take those separately. So the things that happened in the Southern District of New York are A, the evidence before the jury that the NASDAQ was based in Manhattan. B, the evidence before the jury that Merrill Lynch was, that Merrill Lynch, which was the selling, which represented the seller, the selling, essentially the selling broker was headquartered in Manhattan. Three, that there- Being headquartered here has nothing to do with where anything actually happened. So there were specific testimony that the clearing services that Merrill Lynch performed occurred in the, in its Manhattan headquarters here in Manhattan. But wasn't it Southern District or Eastern District? No, not for the Merrill Lynch, Your Honor, not for the Merrill Lynch clearing services. The evidence was, the testimony was quite clear on that point. And I can point you to the record on that. For the purposes of 161, this is the testimony of Mr. Melley. I know that Merrill Lynch's clearing services are located here in Manhattan. And then he goes on to say, and this is at the record of 136, and those clearing and settlement processes, are they a necessary part of any trade? Answer, absolutely. So that was, that's a third point. And then finally, with respect to the testimony about DTCC, which does the other clearing and settlement, there was clear testimony on the record, and this is at the record at 148. The final question that was asked to Mr. Brennan from the DTCC, so the data in Manhattan is used for the production and processing the essential functions of the DTCC? Answer, yes. So you have four really independent bases that the jury had before it. I'm going to eliminate the NASDAQ being headquartered here as a basis for it. Okay, Your Honor. And then just returning back to Your Honor's question about foreseeability, look, Your Honor, this was, you know, the Southern District of New York is at the end of the day, the financial capital of New York. But not only that, the NASDAQ, these stocks here are traded on the NASDAQ. And you have somebody sophisticated who is actually negotiating here for the, you know, to purchase this company, which trades on the NASDAQ. So he, you know, it's part of the- Where were the witnesses to their interactions located? Where was the, where was Mr. Yin? In various places, including Beijing, California, other places. But Your Honor, the issue is here, the offense was the purchase of the sale of securities. That's the act as raised here. That happened. So it's really that, that the venue focus has to be on. And that happened, that happened here in this, you know, constituent, constituent elements of that happened here in the Southern District of New York. And Mr. Xiao was certainly on foreseeable notice, negotiating for the, for the purchase of this company that trades on the NASDAQ, that there would be events here. All right. Thank you very much. I think we have the argument. We'll hear from Mr. Clement. You have two minutes of rebuttal. Thank you, Your Honor. I'd like to just make three points in rebuttal. First, as to the fundamental question about whether you can have a purely contractual duty that's sufficient for fraud. I mean, I didn't make up the term quasi-fiduciary. That is right from this court's case in Chessman. And if you read Chessman, it's clear why this case is so problematic. Because Chessman, in talking about the necessary quasi-fiduciary duty, relationship of trust and confidence, talks about notions of dependence and discretionary judgment. All of that makes sense when you're talking about an employment relationship, an attorney-client relationship. You give discretion to your agent. You then become dependent on your agent. None of that's true when you cross the tracks. Of course, Xiao was a fiduciary to his funds. But he had no fiduciary or quasi-fiduciary relationship to lattice whatsoever. There's no dependency. There's no discretion for him to act on their behalf. This is a completely unprecedented extension. And the reason that O'Donnell and the countrywide cases are relevant is because they make crystal clear that just because you have a breach of contract, you don't have a breach of a fiduciary duty or fraud. As to the second point I'd like to make, Judge Carney, you made the point about whether there was even a breach of the specific NDA. I think if you look at the NDA and the critical provisions, and they're on J.A. 236 and J.A. 243, the way this is structured is there's a definition of proprietary information in Provision 1. In Section 3, there is then an exculpatory provision that says it doesn't cover the information that each party brings to the transaction. And then where there's the actual covenant not to disclose, what you covenant not to disclose is the proprietary information of the other party. So even if the information about the status of the deal constitutes proprietary information, you're still only covenanting not to disclose the information of the other party. So I don't even think this is covered by it. And the reason that's so critical is because of the thinness of the information. Just one point on venue. With all due respect, what they have here is they have evidence that DTTC cleared these, rather, closed these transactions in Brooklyn on the wrong side of the river. All they have with respect to Merrill Lynch is clearing services, which is just the internal bookkeeping of Merrill Lynch in making these transactions. It's never been held to be a critical step in the transaction. And if you want to go back to the Sixth Amendment, which says that you're only supposed to try somebody in the district where the crime was committed, maybe Oregon, maybe California, but the idea that this crime was committed in the southern district where my client never stepped foot seems to me beyond the pale. Thank you. Thank you very much. And you'll give us a letter on the effect of Blackjack on Title 18.